# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANGELA BEATTY,
    Plaintiff

  vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-58
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 13), the Commissioner's response in

opposition (Doc. 16), and plaintiff's reply memorandum. (Doc. 17).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI on June 5, 2007, alleging disability since

September 14, 2006[1], due to migraines. Plaintiff's applications were denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before

Administrative Law Judge (ALJ) Larry Temin. Plaintiff, plaintiff's sister, Lisa Shephard, and a

vocational expert (VE) appeared and testified at the ALJ hearing. On April 21, 2009, the ALJ

issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by

the Appeals Council was denied, making the decision of the ALJ the final administrative

decision of the Commissioner.

---

[1] During the administrative hearing, the disability onset date was amended to March 18, 2007. (Tr. 28).

## II. Medical Evidence

Plaintiff presented to Rolando Go, M.D., in September 2006 with complaints of dizziness and migraine headaches. Dr. Go ordered audiologic testing, which was normal. He also ordered an MRI of the brain which suggested the presence of "mild communicating hydrocephalus." Dr. Go prescribed Valium to control her dizziness and referred her to a neurologist. (Tr. 226-27).

On October 16, 2006, plaintiff presented to the University Hospital emergency room for evaluation of a prolonged, 6/10 headache associated with nausea, but not vomiting, and provoked by light, but not sound. She described her pain as shooting. Examination revealed normal neurological findings, as well as full range of motion and sensation in her extremities. She was given Phenergan, Motrin and Compazine, which resolved her headache, and she was discharged pain-free. (Tr. 223-25).

Plaintiff began treatment with the University Hospital Neurology Clinic on October 23, 2006. She described her pain as a "squeezing pressure" around her head with occasional radiating pain into her temples. She was prescribed Depakote and instructed to continue Lexapro. A spinal tap was performed. (Tr. 220-22).

An MRI of plaintiff's brain taken on November 18, 2006 revealed ventricular dilatation related to hydrocephalus. (Tr. 217). The radiologist interpreting the results opined the MRI was negative, noting no change from the October 2006 CT scan. *Id.* A cervical spine MRI showed congenital stenosis; C5-6 disc protrusion with cord compression; C6-7 disc protrusion with flattening of the right anterior spinal cord; and degenerative changes at C3-4 and C4-5. (Tr. 217-19).

2

Plaintiff presented to the emergency room at University Hospital in January 2007 with a "pressure-like headache." (Tr. 212-16). She described lights and halos around objects in her vision and photophobia. (Tr. 212). Plaintiff denied weakness in her extremities or any problems walking, though her gait was noted as being unstable. (Tr. 212-13). A neurological exam was normal. (Tr. 213). A head CT showed moderate hydropchephalus stable compared to her previous October 2006 exam. (Tr. 213, 215-16). She was treated with Toradol and Compazine and was reported as being pain-free in the emergency room. (Tr. 213).

In March 2007, plaintiff presented to the emergency room at Christ Hospital with a migraine headache. She rated her pain at 7/10 and had associated nausea. Plaintiff was treated with Dilaudid and was in stable condition on discharge. (Tr. 206-07).

Plaintiff's treated at the University Hospital Neurology Clinic from October 2006 to December 2008. (Tr. 210-11; 220-22; 235-36; 271-80). Progress notes demonstrate that plaintiff complained of daily headaches with occipital pressure and radiation into the eyes. (Tr. 210, 235, 272). She stated that her pain worsened throughout the day resulting in nausea, photophobia/phonophobia, decreased vision, and facial numbness. *Id.* Mentally, plaintiff reported symptoms of depression, fatigue, and difficulty concentrating. (Tr. 210, 226, 235). On examination, plaintiff had decreased sensation to light touch on the right side of her face. (Tr. 211). She was described as "very depressed." *Id.* She was prescribed various medications, including Paxil, Cyclobenzaprine, Neurontin, Imitrex, Compazine, Effexor and Prednisone. (Tr. 211, 236, 273). Plaintiff also received a trigger point injection to the right occipital/neck region. (Tr. 236). June 2007 progress notes demonstrate that plaintiff had normal neurological, motor, and coordination findings. (Tr. 211).

3

In August 2007, state agency reviewing physician, Eli Perencevich, D.O., reviewed plaintiff's medical record and opined that plaintiff had no exertional, postural, or manipulative limitations. (Tr. 260-67). Dr. Perencevich further opined that, based on plaintiff's history of migraines, she should avoid concentrated exposure to noise, respiratory irritants like fumes, odors, or dust, and hazards such as machinery and heights. (Tr. 264). Dr. Perencevich noted that, in forming his opinion, he relied on prior MRIs and CTs of plaintiff's stable hydrocephalus, normal neurological findings, and plaintiff's subjective reports. *Id.* This assessment was affirmed by agency doctor Gary Demuth, M.D., in January 2008. (Tr. 259).

In December 2007, plaintiff was seen by Dale Seifert, M.S. Ed., a consultative psychologist, for an evaluation. Plaintiff reported frequent crying, difficulty sleeping, difficulty concentrating and focusing, anxiety and episodes of rage. She stated she felt she should be in counseling but explained that she was not because she did not have insurance. Plaintiff also reported trouble relating to people. She noted that while she got along well with supervisors and coworkers at past jobs, she was not a reliable worker because she missed days. Dr. Seifert noted that plaintiff had a flat affect, poor eye contact, and was not highly verbal, but that she responded well to questions and there were no problems with articulation. Plaintiff reported that her daily activities consist of doing some chores, going shopping with her boyfriend, spending time with her children, watching TV, and talking to her sister. Plaintiff was diagnosed with an unspecified mood disorder and assigned a Global Assessment of Functioning (GAF)[2] score of 65. Dr. Seifert

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 61 to 70, are classified as having "some mild" symptoms who is "generally functioning pretty well." *Id.*

opined that plaintiff had mild limitations in her ability to relate to others, including coworkers and supervisors; mild limitations in her ability to understand and follow instructions; moderate limitations in her ability to maintain attention to perform simple, repetitive tasks; and moderate limitations in her ability to withstand the stress and pressures of day-to-day work. (Tr. 228-32).

In January 2008, state agency reviewing psychologist, Alice Chambly, Psy. D., completed a mental residual functional capacity (RFC) assessment and opined that plaintiff did not have any mental impairments that met or medically equaled a Listing. (Tr. 240). Dr. Chambly concluded that plaintiff had mild limitations in activities of daily living; moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 250). Dr. Chambly noted several inconsistent statements made by plaintiff in her records regarding a lack of personal relationships and whether she drove. (Tr. 256). Dr. Chambly noted that the records contradicted these statements as they demonstrated that plaintiff had a boyfriend, drove herself to her psychological consultative examination, lived with friends and maintained relationships with various relatives as well. *Id.* Dr. Chambly opined that plaintiff "[w]ould be able to adapt to a low stress, simple, repetitive work with no production pressures and limited interaction with other workers." *Id.*

In August 2008, plaintiff presented to the emergency room at University Hospital with a headache and reported a history of chronic daily headaches which was "slightly worse today." Plaintiff rated her headache as an 8/10 on the pain scale with tightness in her neck. She denied any fever, chills, nausea, vomiting, blurred vision, double vision, slurred speech, numbness or weakness, any chest pain, shortness of breath, abdominal pain. She denied any recent history of

5

memory loss, dropping things, or confusion. It was noted that plaintiff had a history of communicating hydrocephalus, that her last head CT scan was over a year ago, and her last lumbar puncture to remove spinal fluid was a year and a half ago. Plaintiff reported that she had not treated this specific headache. She also reported that she had previously seen a neurologist but she stopped because she did not feel the doctors were taking her seriously; rather, they were just prescribing her anti-depression medicines which she did not take. The emergency room physician opined that the headache was benign. He noted that plaintiff's gait was normal and that she did not have neck rigidity. Plaintiff was treated with Toradol, Compazine, and saline. Her pain totally resolved with medication and she was discharged in stable condition. (Tr. 293-97).

The record includes plaintiff's treatment notes from Scioto Paint Valley Mental Health Center ("Scioto"). These records demonstrate that plaintiff began treating with Scioto in October 2008, that her last session was in November 2008, and that in February 2009 her treatment was terminated because she did not return. (Tr. 282). At a November 2008 assessment, plaintiff reported that she was living with her mother and that she had significant others outside of her family who provided emotional support. (Tr. 284). Plaintiff's response to questioning about her employment interests was "not really." (Tr. 285). Her affect was noted as being appropriate, her insight was fair, and her mood was depressed, but she was cooperative with normal thought content and speech. She reported no past psychiatric hospitalizations. (Tr. 286). Plaintiff's prior diagnoses of depression and social anxiety were noted (Tr. 286), but she was diagnosed with depression, not otherwise specified, and assigned a GAF score of 60 to 70. (Tr. 290).

Individual counseling was recommended but she did not follow up and her treatment at Scioto was terminated. (Tr. 289, 282).

In December 2008, plaintiff followed up with her neurologist and reported that her migraines had decreased in frequency from daily occurrences to three times per week and that she believed her medication was helping. Plaintiff reported pain at a level of 5 out of 10. She reported her depression was not significantly worsening, even though she felt Paxil was not working as well as before. Examination revealed full muscle strength and tone in all muscle groups, full sensation, and normal coordination and gait. She was taken off Paxil and put on Effexor. (Tr. 271-74).

In January 2009, an MRI of plaintiff's cervical spine showed central disc protrusion at C5-C6 and C6-C7, as well as mild cord compression at C5-C6. (Tr. 269-70).

The record contains February 2009 partial treatment notes from Dr. Jeffrey Lobel at the Center for Advanced Orthopaedics. Plaintiff complained of neck and lumbar pain. She described her neck pain as a daily ache that radiates into her shoulder and her lumbar pain as a sharp, stabbing pain that radiates into her right leg. (Tr. 308).

In a March 5, 2009 letter, certified nurse practitioner Raymond Mick ("CNP Mick") opined that plaintiff's "hydrocephalus is intensified by exposure to bright light, fumes and noise. Excessive vibration, heat and/or cold intensify her fatigue and myalgias, so she is unlikely to perform well in any of these situations." He further opined that stress and anxiety from her illness "presents barriers to dealing with individuals" in a work setting. (Tr. 299).

7

CNP Mick also completed a work assessment form on March 3, 2009 in which he reported that he saw plaintiff once or twice per month for the past five months for hydrocephalus and fatigue. (Tr. 300). Her prognosis was "fair to good" but due to "nearly continuous cephalgia and malaise" CNP Mick stated that plaintiff's ability to tolerate work stress was so impaired that she was incapable of even low stress work. (Tr. 300-01). CNP Mick opined that plaintiff could only sit four hours in a workday for one hour at a time and stand less than two hours in a workday for up to 30 minutes at a time. (Tr. 302). He concluded that she must walk 3-4 minutes every 20-30 minutes and shift position at will. *Id*. CNP Mick also stated that plaintiff would need a 15-20 minute break every 1-2 hours and would have to keep her legs elevated 20-24 inches off the ground for 75% of the workday. (Tr. 302-03). CNP Mick further opined that plaintiff could: occasionally lift up to 10 pounds; rarely lift up to 20 pounds; occasionally twist; rarely stoop, crouch, or climb stairs; and never climb ladders. (Tr. 303). He also stated that plaintiff could only handle objects 10% of the day, could never reach, and would miss work more than 4 times per month. (Tr. 304). CNP Mick based these conclusions on the following clinical findings: flat but somewhat anxious affect, generalized tenderness upon palpation and movement, as well as plaintiff's slow, deliberate movements. (Tr. 300).

The record also includes a one page letter, dated April 10, 2009, from plaintiff's neurologist, Angela Rackley, M.D. Dr. Rackley's letter described plaintiff's prior diagnoses, subjective complaints of pain, and treatment. Dr. Rackley noted that plaintiff's headaches occurred daily and required her to "rest/lay down several hours per day." Dr. Rackley stated that

she was in the process of obtaining records and prior evaluations and concluded that plaintiff was "unable to maintain employment." (Tr. 306).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant meets the insured status of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since April 18, 2007, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*)

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, headaches, hydrocephalus, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity (RFC) to perform the requirements of work activity except as follows: she can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for six hours in an eight-hour workday. She can only occasionally stoop, kneel, crouch, and climb ramps and stairs. She is

unable to crawl or climb ladders, ropes, or scaffolds. She is unable to work at unprotected heights or around hazardous machinery. She cannot work with concentrated exposure to a loud noise intensity level, or to fumes, noxious odors, dusts, and gases. She is able to remember and carry out only short and simple instructions. She cannot interact with coworkers, supervisors, or the general public on more than an occasional basis. Any job she could perform should not require more than ordinary and routine changes in the work setting or duties. She is able to make only simple work-related decisions.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on July 12, 1972, and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has a high school equivalent education (a GED) and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404 Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2007, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred in assessing her RFC and not crediting

limitations provided by plaintiff's treating sources; and (2) the ALJ erred in determining

plaintiff's credibility.

> 1. The ALJ erred in formulating plaintiff's RFC by not explaining his omission of
> limitations assigned by state reviewing psychologist Dr. Chambly, but did not err
> in assessing the weight to afford the opinions of Dr. Rackley and CNP Mick.

Plaintiff contends that the ALJ erred in formulating plaintiff's RFC by not accounting for

limitations put forth by CNP Mick, Dr. Rackley, and Dr. Chambly. Specifically, plaintiff asserts

that the ALJ erred by not including the following in devising plaintiff's RFC: (1) CNP Mick's

opinion that plaintiff would miss four days of work monthly due to headache pain; (2) Dr.

Rackley's opinion that plaintiff was precluded from work due to her need to rest for several

hours per day due to headache pain; and (3) Dr. Chambly's opinion that plaintiff would be able

to adapt to work with no production pressures. Essentially, plaintiff argues that the ALJ did not

afford sufficient weight to her treating sources or to Dr. Chambly's opinion and, further, that the

objective medical evidence of record supports the limitations.

In his decision, the ALJ addressed the opinions of CNP Mick and Dr. Rackley and

accorded them "little weight." (Tr. 15). With regard to Dr. Rackley, the ALJ noted that there

were no treatment records from Dr. Rackley in the record, that her opinion appeared largely

based on plaintiff's self-reports and not on objective clinical tests or findings, and that it was

unclear whether Dr. Rackley had ever examined plaintiff or even reviewed her prior treatment

13

records. *Id.* The ALJ's determination to afford little weight to Dr. Rackley's opinion is supported by substantial evidence.

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

"A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.' 20 C.F.R. § 404.1502. A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.' *Id.*" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

Here, the ALJ gave "little weight" to Dr. Rackley's opinion that plaintiff required daily resting periods of several hours because the file contained no records from Dr. Rackley, nor did the record demonstrate that Dr. Rackley had treated plaintiff or reviewed the prior treatment notes from plaintiff's other doctors. Dr. Rackley's April 10, 2009 letter states that plaintiff had been referred to her and she was "in the process of obtaining records and prior evaluation/management" (Tr. 306), indicating that Dr. Rackley had not reviewed plaintiff's medical history prior to assessing her limitations. Further, it is not clear whether Dr. Rackley had even examined plaintiff prior to providing her opinion, given the lack of any treatment records or any reference to an evaluation of plaintiff in the letter. The ALJ reasonably concluded that Dr. Rackley's opinion appeared to be based on plaintiff's self-report. Accordingly, the evidence of record does not demonstrate that the ALJ was required to give any special deference or additional weight to Dr. Rackley's opinion. *See Barker*, 40 F.3d at 794 (treating physician rule is premised on the notion that a physician who has treated a patient over time is in a better position to assess the severity of her impairments and her limitations).

Even if Dr. Rackley had a treating relationship with plaintiff, the ALJ was not required to afford more weight to her opinion due to the lack of clinical or objective medical evidence supporting the opinion. The only document from Dr. Rackley in the record is the one-page letter in which she opined that plaintiff suffers from daily, intractable migraine headaches that require her to rest or lay down several hours a day. (Tr. 306). Aside from plaintiff's subjective reports,

16

there is no medical data or opinion in the record that supports this limitation. *See* 20 C.F.R. §§ 404.1508 (impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, and not solely by claimant's statement of symptoms); 404.1528(a) (claimant's own description of impairment is not enough to establish existence of that impairment). *See also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.") (internal citations and quotations omitted).

The clinical evidence of record regarding plaintiff's headaches primarily consists of her visits to emergency rooms and her treatment at the University Hospital Neurology Clinic. Plaintiff sought treatment in emergency rooms for headache pain four times in three years and on each occasion her pain was successfully treated with medication. *See* Tr. 223-25 (in October 2006 plaintiff received medication for headache and discharged pain-free); Tr. 212-16 (in January 2007 plaintiff reported being pain-free in emergency room after receiving headache medication); Tr. 206-07 (in March 2007 plaintiff was given Dilaudid for headache pain and discharged in stable condition); Tr. 293-97 (in August 2008 plaintiff's headache pain was totally resolved in emergency room after receiving medication). The record further demonstrates that plaintiff was treated at the University Hospital Neurology Clinic on four occasions from October 23, 2006 to December 9, 2008. (Tr. 210-11; 220-22; 235-36; 271-80). These records contain doctors' and clinicians' notes that plaintiff's headaches were successfully treated with procedures or medication. *See, e.g.,* Tr. 221 (in October 2006 plaintiff reported no headache after successful spinal tap); Tr. 272 (plaintiff reported the frequency of headaches decreased

17

from daily occurrences to three times per week; noting improvement in headaches due to medications Flexeril and Neurontin). The overwhelming majority of plaintiff's records for headache treatment demonstrate that her headache pain resolved with medication and that the frequency of her headaches was not as reported by Dr. Rackley.[3] This clinical evidence is inconsistent with Dr. Rackley's unsubstantiated limitations and further supports the ALJ's decision to afford "little weight" to Dr. Rackley's opinion. *See* 20 C.F.R. § 404.1527(d); *Harris*, 756 F.2d 431 (6th Cir. 1985).

In addition, Dr. Rackley's opinion that plaintiff is "unable to maintain employment" is not entitled to any deference. The ALJ is responsible for determining whether plaintiff meets the statutory definition of disability based on the medical and vocational evidence in the record. *See* 20 C.F.R. § 404.1527(e)(1). A treating physician's "broad conclusory formulations, regarding the ultimate issue which must be decided by the [Commissioner], are not determinative of whether or not an individual is under a disability." *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). Here, the ALJ properly weighed the medical evidence of record and gave "little weight" to Dr. Rackley's opinion based on the lack of supporting clinical or diagnostic evidence, the doctor's unfamiliarity with plaintiff's medical and treatment history, and her brief, possibly non-existent, treatment relationship with plaintiff. Accordingly, the ALJ appropriately

---

[3] Plaintiff argues that a comment that she was "stable" on discharge from these emergency room visits does not mean that her symptoms were resolved. (Doc. 13, p. 12). However, the record shows that plaintiff was "pain free" after receiving Penergan, Motrin, and Compazine (Tr. 224), "pain free in the emergency department with medication" (Tr. 213), and that "[h]er pain totally resolved with treatment with Toradol and Compazine plus [saline]." (Tr. 293). These notes demonstrate that plaintiff's pain was completely resolved with medication on at least three of the four emergency room visits of record.

considered the factors set forth in § 404.1527(d) and his determination to give "little weight" to Dr. Rackley's opinion is substantially supported.

With regard to the opinion of CNP Mick, the ALJ gave "little weight" to Mr. Mick's conclusions because, similar to Dr. Rackley's opinion, they were not supported by objective clinical findings or the other evidence of record. (Tr. 15). Specifically, the ALJ noted that CNP Mick limited plaintiff to standing/walking for less than two hours in an eight-hour workday but that the objective medical evidence did not support the severity of these limitations. The ALJ's decision to give "little weight" to CNP Mick's opinion is supported by the evidence of record.

First, nurse practitioners such as CNP Mick are not considered acceptable medical sources and, accordingly, the ALJ *may*, but is not obligated to, give weight to his opinions. *See* 20 C.F.R. § 404.1513(d). Social Security Ruling 06-3p provides that "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source . . . if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-3p. Thus, despite not being considered an acceptable medical source, if CNP Mick's opinions are well-explained and supported by evidence they could be given significant weight. Here, however, the only records from CNP Mick are his one–page letter and an RFC form, unaccompanied by any treatment notes or clinical findings, and his opinions are contradicted by other objective evidence of record. Consequently, the ALJ's determination to accord his opinion "little weight" is substantially supported.

CNP Mick also opined that plaintiff would miss up to four days of work per month due to headache pain (Tr. 304) and that she would need to elevate her legs 20 to 24 inches for 75% of the day. (Tr. 303). Mr. Mick additionally limited plaintiff's use of her hands and fingers to grasp and manipulate objects to ten percent of an eight hour work day. (Tr. 304). Although CNP Mick noted that he had treated plaintiff for five months at the time he completed the RFC form, the record does not include any supporting treatment notes or clinical or diagnostic tests to substantiate these limitations. Accordingly, the ALJ was not bound by these conclusory, unsubstantiated statements. *See Buxton*, 246 F.3d at 773.

Second, the objective evidence of record is inconsistent with CNP Mick's limitations regarding plaintiff's legs and manual dexterity. *See* Tr. 224 (at October 2006 emergency room visit plaintiff demonstrated an even gait and full range of motion and sensation in extremities); Tr. 212-13 (January 2007 emergency room notes indicate that plaintiff denied weakness in arms or legs or problems with gait); Tr. 211 (June 2007 notes from the neurology clinic demonstrate that plaintiff had normal neurological, motor, and coordination examination results with full muscle strength); Tr. 263 (in August 2007, Dr. Perencivich opined that plaintiff had no manipulative limitations); Tr. 293 (August 2008 emergency room notes show that plaintiff presented with a normal gait and reported no difficulty walking or weakness); Tr. 273 (December 2008 notes from a follow up with the neurology clinic show that plaintiff had full muscle strength in all major muscle groups, normal muscle tone in upper and lower extremities; and normal gait). As the objective evidence of record contradicts CNP Mick's findings, which

are unsupported by any contemporaneous clinical or treatment records, the ALJ's determination to give "little weight" to his opinions is substantially supported.

Plaintiff contends that her diagnosis of hydrocephalus, "a condition that causes swelling and pressure, naturally leading to headaches," is objective evidence that supports both Dr. Rackley's and CNP Mick's opinions and prescribed limitations. (Doc. 13, p. 9). However, a mere diagnosis or existence of a severe impairment does not indicate the functional limitations caused by the impairment. *See Young v. Sec'y of H.H.S.*, 925 F.2d 146, 151 (6th Cir. 1990). Plaintiff asserts that she has disabling pain due to headaches, but "there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition[.]" *Id.* at 150-51. Here, despite plaintiff's diagnosis of hydrocephalus, the objective medical evidence does not demonstrate that this condition causes plaintiff to experience disabling headache pain and, notably, no doctor has ever opined that the hydrocephalus is the cause of these headaches.

At the administrative hearing, the ALJ specifically noted that the evidence of record did not establish this requisite connection. The ALJ provided plaintiff additional time to gather further medical evidence and stated that he needed "something from a neurologist or a neurosurgeon that says that the level of hydrocephalus that [plaintiff] has could cause headaches of the severity and frequency that she's having them[.]" (Tr. 61). All plaintiff provided in response was the one-page letter from Dr. Rackley opining that plaintiff had migraine headaches that require her to rest several hours daily. This is insufficient to establish the link between plaintiff's hydrocephalus and her allegedly disabling headaches. Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.*, 923 F.2d

21

1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Plaintiff failed to provide the necessary evidence to establish her disability. Accordingly, despite plaintiff's diagnosis of hydrocephalus, the ALJ's decision to afford little weight to the opinions of Dr. Rackley and CNP Mick remains substantially supported.

Lastly, regarding Dr. Chambly, the state agency reviewing psychologist, plaintiff argues that the ALJ erred by not restricting plaintiff's RFC to work requiring no production quotas, citing Dr. Chambly's opinion that plaintiff "[w]ould be able to adapt to [] low stress, simple, repetitive work with no production pressures and limited interaction with other workers." (Tr. 256). Plaintiff's argument is well-taken.

In his decision the ALJ gave "significant weight" to the state agency opinions as they were consistent with the objective medical evidence. (Tr. 15). The ALJ adopted the majority of Dr. Chambly's mental RFC assessment and limited plaintiff to work where she is only required to carry out short and simple instructions, interact occasionally with others, make only simple work-related decisions, and not have more than ordinary and routine changes in the work setting or duties. (Tr. 13). The only limitation that the ALJ did not adopt from Dr. Chambly's RFC was her opinion that plaintiff required work "with no production pressures." (Tr. 13, 256).

"Generally speaking, an ALJ must consider in accordance with the regulations the opinion evidence provided by non-examining state agency physicians. 20 C.F.R. §§ 404.1527(f), 416.927(f). Unless the [plaintiff's] treating physician is given controlling weight, the ALJ also must explain in the written decision the weight given to the opinions of the state agency physicians; however, the ALJ is not bound by those opinions." *Barker v. Astrue*, No.

5:09cv1171, 2010 WL 2710520, at *5 (N.D. Ohio July 7, 2010). *See also* SSR 96-6p (an ALJ "must explain the weight given to these opinions in their decisions"). "It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Here, the ALJ's decision explains that he gave "significant weight" to Dr. Chambly's opinion noting its consistency with the objective medical evidence. The ALJ largely adopted Dr. Chambly's mental RFC assessment (Tr. 13, 15); however, the ALJ did not provide any explanation for omitting the production quota restriction from his RFC. By not explaining this omission, which, if included, would have precluded plaintiff from work[4], the Court is unable to engage in a meaningful review of the ALJ's decision. *See Bledsoe v. Comm'r of Soc. Sec.*, No. 09cv564, 2011 WL 549861, at *5 (S.D. Ohio Feb. 8, 2011) (Barrett, J.) (ALJ's failure to explain exclusion of limitations provided by a state agency physician was an error of law requiring remand). Though the ALJ was not bound by Dr. Chambly's opinion, he was required to provide an explanation for excluding this specific limitation. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result"). Without this

---

[4] At the hearing, the VE testified that if plaintiff were restricted from production-oriented work, on top of her other limitations, she would be precluded from work. (Tr. 55).

explanation, the Court is unable to determine whether the ALJ rejected or simply overlooked the limitation of "no production pressures." Further, this is not harmless error because, as the VE testified, if plaintiff were restricted to jobs without production pressures she would be precluded from work. (Tr. 55); *see also Bledsoe*, 2011 WL 549861, at *5. Accordingly, this matter should be remanded with instructions to the ALJ to provide specific reasons for omitting this portion of Dr. Chambly's opinion in formulating plaintiff's RFC.

### 2. The ALJ's credibility determination is substantially supported.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton,* 246 F.3d at 773; *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). In determining credibility, the ALJ may consider the claimant's testimony of limitations in light of other evidence of the claimant's ability to perform other tasks such as walking, going to church, going on vacation, cooking, vacuuming and making beds. *Heston v. Comm'r,* 245 F.3d 528, 536 (6th Cir. 2001).

The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has

24

taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; 6) any measures other than

treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his

or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other

factors concerning the individual's functional limitations and restrictions due to pain or other

symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Plaintiff contends the ALJ improperly assessed her credibility. Plaintiff asserts her

testimony concerning her headaches is supported by objective medical evidence and lay witness

testimony. Plaintiff further argues that the ALJ mischaracterized the medical evidence and that

the emergency room records noting that plaintiff was stable after being treated for headaches

does not mean that she was pain free; rather, as plaintiff testified, her headache pain is constant

but occasionally lessened by medication.

In determining plaintiff's credibility in the instant case, the ALJ noted that although

plaintiff testified that her headache pain never completely resolves (Tr. 43), the medical evidence

from plaintiff's emergency room visits, discussed *supra*, demonstrates the contrary - that

plaintiff's pain completely resolved with mediation. *See* Tr. 213 (plaintiff was "pain free" after

medication); Tr. 224 (same); Tr. 293 (plaintiff's "pain totally resolved" with medication). The

ALJ also reasonably noted that plaintiff's failure to follow up with a neurologist as directed

undercuts her claims that she has daily incapacitating headaches. (Tr. 14). Further, plaintiff

testified that she had musculoskeletal pain and difficulty walking, but as the ALJ reasonably

found the medical evidence demonstrates that plaintiff consistently had normal neurological

findings, full muscle strength, and a normal gait. *See* Tr. 224 (plaintiff demonstrated an even

gait and full range of motion and sensation in extremities); Tr. 212-13 (plaintiff denied weakness

in arms or legs or problems with gait); Tr. 211 (plaintiff had normal neurological, motor, and

coordination examination results with full muscle strength); Tr. 293 (plaintiff presented with a

normal gait and reported no difficulty walking or weakness); Tr. 273 (plaintiff had full muscle

strength in all major muscle groups, normal muscle tone in upper and lower extremities, and a

normal gait). In addition, while plaintiff testified that she had daily headaches since April 2007

(Tr. 34), she reported in August 2008 that the frequency of her headaches had decreased to three

per week. (Tr. 272). In light of these contradictions, and the other factors cited by the ALJ,

there is substantial evidence supporting the ALJ's credibility finding and plaintiff's second

assignment of error should be overruled.

### E. This matter should be reversed and remanded for further proceedings.

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for

further proceedings. Remand is appropriate because the ALJ did not adhere to the requirements

of 20 C.F.R. §§ 404.1527(f) and 416.927(f) in omitting a crucial portion of Dr. Chambly's RFC

assessment without providing any explanation for the omission. *See Faucher v. Sec'y of H.H.S.*,

17 F.3d 171, 175 (remand is appropriate where [Commissioner] misapplied regulations). This

matter should be remanded for reconsideration of plaintiff's RFC and the weight afforded to all

aspects of Dr. Chambly's RFC assessment.

26

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 11/21/2011

Karen L. Litkovitz
United States Magistrate Judge

ANGELA BEATTY,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-58
Barrett, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).